## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

PADRES UNIDOS DE TULSA, et al.,

*Plaintiffs*,

v.

GENTNER DRUMMOND, et al.,

*Defendants*.

Case No. 5:24-cv-00526

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 2

   A.  Congress's Pervasive Regulation of Immigration ..................................... 2

   B.  Oklahoma H.B. 4156 ............................................................................... 4

   C.  Challenges to H.B. 4156 .......................................................................... 5

STANDARD OF REVIEW ....................................................................................... 6

ARGUMENT ............................................................................................................ 6

   I.  H.B. 4156 is Preempted. .......................................................................... 6

   A.  H.B. 4156 Intrudes on the Exclusively Federal Field of Entry. ............... 7

   B.  H.B. 4156's Expulsion Power Intensifies the Statute's Incompatibility with Federal Law ........................................................................................... 12

   C.  H.B. 4156 Conflicts with the Federal Immigration System. .................. 15

   D.  H.B. 4156 violates the Commerce Clause. ............................................ 19

   II.  Plaintiffs Will Suffer Irreparable Injury Absent an Injunction .......................... 22

   III.  The Balance of Equities and Public Interest Support an Injunction. ................. 23

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*,
  567 U.S. 387 (2012) ...................................................................................... passim

*Baldwin v. G.A.F. Seelig, Inc.*,
  294 U.S. 511 (1935) ............................................................................................ 20

*Biden v. Texas*,
  597 U.S. 785 (2022) ........................................................................................ 4, 17

*Brown v. Day*,
  434 F. Supp. 2d 1035 (D. Kan. 2006) ............................................................... 23

*Chy Lung v. Freeman*,
  92 U.S. 275 (1875) .......................................................................................... 7, 17

*City of Philadelphia v. New Jersey*,
  437 U.S. 617 (1978) ...................................................................................... 20, 21

*Colo. Motor Carriers Ass'n v. Town of Vail*,
  No. 23-CV-2752, 2023 WL 8702074 (D. Colo. Dec. 15, 2023) ....................... 24

*Covington & C. Bridge Co. v. Commonwealth of Kentucky*,
  154 U.S. 204 (1894) ............................................................................................ 20

*DeCanas v. Bica*,
  424 U.S. 351 (1976) ........................................................................................ 8, 10

*Denver Homeless Out Loud v. Denver*,
  32 F.4th 1259 (10th Cir. 2022) ............................................................................ 6

*Dep't of Revenue of Ky. v. Davis*,
  553 U.S. 328 (2008) ............................................................................................ 20

*Edwards v. California*,
  314 U.S. 160 (1941) ...................................................................................... 21, 22

*Evans v. Utah*,
  21 F. Supp. 3d 1192 (D. Utah 2014) .................................................................. 23

*Farmworker Ass'n of Fla., Inc. v. Moody*,
  No. 23-CV-22655, 2024 WL 2310150 (S.D. Fla. May 22, 2024) ............................ 1, 22

*Fong Yue Ting v. United States*,
  149 U.S. 698 (1893) ................................................................................................. 8

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
  691 F.3d 1250 (11th Cir. 2012) ........................................................... 4, 9, 18, 22

*Galvan v. Press*,
  347 U.S. 522 (1954) ................................................................................................. 7

*Georgia Latino All. for Hum. Rts. v. Deal*,
  793 F. Supp. 2d 1317 (N.D. Ga. 2011) ............................................................... 22

*Heartland Acad. Cmty. Church v. Waddle*,
  335 F.3d 684 (8th Cir. 2003) ............................................................................... 23

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ............................................................................................... 8, 9

*Hoke v. United States*,
  227 U.S. 308 (1913) ............................................................................................... 20

*INS v. Yueh-Shaio Yang*,
  519 U.S. 26 (1996) ................................................................................................... 4

*Lozano v. City of Hazleton*,
  724 F.3d 297 (3d Cir. 2013) ................................................................................... 9

*Make the Road New York v. Pompeo*,
  475 F. Supp. 3d 232 (S.D.N.Y. 2020) .................................................................. 25

*Matter of E-R-M- & L-R-M-*,
  25 I. & N. Dec. 520 (BIA 2011) ............................................................................. 4

*Nishimura Ekiu v. United States*,
  142 U.S. 651 (1892) ................................................................................................. 8

*Nken v. Holder*,
  556 U.S. 418, 435 (2009) ...................................................................................... 23

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013) ........................................................................... 24

*Ore. Waste Sys., Inc. v. Dep't of Environmental Quality of Ore.*,
  511 U.S. 93 (1994) ........................................................................... 20, 21, 22

*Plyler v. Doe*,
  457 U.S. 202 (1982) ................................................................................. 8

*Reiland v. Indep. Sch. Dist. No. 11 of Tulsa Cnty., Oklahoma*,
  2022 WL 20689737 (N.D. Okla. Nov. 1, 2022) ....................................... 23

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ............................................................................... 14

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ................................................................................. 7

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948) ................................................................................. 8

*Toll v. Moreno*,
  458 U.S. 1 (1982) ..................................................................................... 9

*Trans World Airlines, Inc. v. Mattox*,
  897 F.2d 773 (5th Cir. 1990) ................................................................. 24

*Truax v. Raich*,
  239 U.S. 33 (1915) ............................................................................. 8, 18

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ....................................................... 13, 24

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ................................................................................. 9

*United States v. Guest*,
  383 U.S. 745 (1966) ............................................................................... 20

*United States v. Oklahoma*,
  No. 24-cv-00511 (W.D. Okla.) ................................................................. 5

*United States v. Texas*,
  586 F. Supp. 3d 574 (W.D. Tex. 2022) ................................................... 16

*United States v. Texas*,
  599 U.S. 670 (2023) ............................................................................... 17

*United States v. Texas*,
   97 F.4th 268 (5th Cir. 2024).................................................................passim

*United States v. Texas*,
   No. 1:23-CV-1537-DAE, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024)..........10, 24, 25

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013)..................................................................22

*Villas at Parkside Partners v. City of Farmers Branch*,
   577 F. Supp. 2d 858 (N.D. Tex. 2008).........................................................23

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*,
   726 F.3d 524 (5th Cir. 2013).................................................................18, 19

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..................................................................................6

## Statutes

8 U.S.C. § 1101 ....................................................................................2

8 U.S.C. § 1101(a)(15)(T) .......................................................................4

8 U.S.C. § 1101(a)(15)(U) .......................................................................4

8 U.S.C. § 1101(a)(27)(J) .......................................................................4

8 U.S.C. § 1153 .................................................................................10

8 U.S.C. § 1158 .................................................................................13

8 U.S.C. § 1158(a)(1) ............................................................................3

8 U.S.C. § 1158(d)(2) ...........................................................................14

8 U.S.C. § 1182 ...................................................................................2

8 U.S.C. § 1182(a)(6) ............................................................................2

8 U.S.C. § 1182(d)(5)(A)........................................................................10

8 U.S.C. § 1184 .................................................................................10

8 U.S.C. § 1225 ..............................................................................10, 13

8 U.S.C. § 1225(b) .................................................................................................. 10

8 U.S.C. § 1225(b)(1) .......................................................................................... 3, 17

8 U.S.C. § 1225(b)(1)(A)(ii) ................................................................................... 14

8 U.S.C. § 1229 ....................................................................................................... 13

8 U.S.C. § 1229(a)(1)(F)(i) ..................................................................................... 14

8 U.S.C. § 1229a .................................................................................... 3, 10, 13, 17

8 U.S.C. § 1229b(b) .................................................................................................. 3

8 U.S.C. § 1231(a)(1)(A) ........................................................................................ 14

8 U.S.C. § 1231(b)(3) ......................................................................................... 3, 13

8 U.S.C. § 1254(a) .................................................................................................... 4

8 U.S.C. § 1321 ........................................................................................................ 3

8 U.S.C. § 1323 .................................................................................................. 3, 10

8 U.S.C. § 1324 .................................................................................................. 3, 10

8 U.S.C. § 1325 ...................................................................................... 3, 10, 16, 17

8 U.S.C. § 1325(a) .................................................................................................. 12

8 U.S.C. § 1326 ...................................................................................... 3, 10, 17

8 U.S.C. § 1326(a) .................................................................................................. 19

8 U.S.C. § 1327 ...................................................................................................... 10

8 U.S.C. § 1328 ...................................................................................................... 10

8 U.S.C. § 1329 .................................................................................................. 3, 10

8 U.S.C. §§ 1151–1382 ............................................................................................. 2

8 U.S.C. §§ 1226(a)-(c) .......................................................................................... 10

H.B. 4156 ........................................................................................................ passim

**Other Authorities**

David Bier, *Fentanyl Is Smuggled for U.S. Citizens by U.S. Citizens, Not Asylum Seekers*, Cato Inst. (Sept. 14, 2022) ...........................................................................21

Statement of Brian Sulc, Executive Director, Transnational Organized Crime Mission Center, Office of Intelligence and Analysis, Department of Homeland Security (May 18, 2022)...................................................................................................22

U.S. Sentencing Comm'n,
*Quick Facts: Fentanyl Trafficking Offenses* (2022) .....................................................22


**Regulations**

8 C.F.R. § 208.7.......................................................................................................14


**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 ...................................................................................19

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs hereby respectfully move the Court for a preliminary injunction restraining Defendants from enforcing any provision of House Bill 4156 ("H.B. 4156") (codified at Okla. Stat. tit. 21, § 1795), signed into law by Oklahoma Governor Stitt on April 30, 2024, during the pendency of this litigation. H.B. 4156 regulates the entry, presence, and expulsion from Oklahoma of noncitizens who have entered the United States without inspection. As explained in the supporting brief, H.B. 4156 violates the Supremacy and Commerce Clauses of the United States Constitution. Absent expedited and preliminary injunctive relief, Plaintiffs will suffer immediate and irreparable harm. Because H.B. 4156 will go into effect on July 1, 2024, Plaintiffs respectfully request that the Court expedite a ruling on this motion.

## INTRODUCTION

H.B. 4156 is Oklahoma's attempt to wrest control over immigration from the federal government, contrary to nearly 150 years of Supreme Court precedent. H.B. 4156 allows Oklahoma to unilaterally arrest, prosecute, detain, and banish from the State large categories of noncitizens—even though the Court has repeatedly re-affirmed the bedrock principle that regulating immigration is an *exclusively* federal power. Not only did Oklahoma enact H.B. 4156 in the face of longstanding precedent, but it did so on the heels of a decision by the Fifth Circuit holding that a very similar law was a preempted attempt by Texas to "achieve its own immigration policy." *United States v. Texas*, 97 F.4th 268, 292 (5th Cir. 2024). And just this week, a federal court in Florida enjoined a law that created new state immigration crimes, because doing so "intrudes" on the federal immigration scheme. *Farmworker Ass'n of Fla., Inc. v. Moody*, No. 23-CV-22655, 2024 WL 2310150, at *15, 16 (S.D. Fla. May 22, 2024) (Altman, J.). H.B. 4156 suffers from the same defects as the Texas and Florida laws, and should be similarly enjoined.

If H.B. 4156 takes effect on July 1, it will gravely interfere with the "comprehensive federal statutory scheme" Congress created to govern noncitizens' entry, presence, and removal. *Texas,* 97 F.4th at 279. It will hand the State unilateral enforcement power and "subvert[] federal authority" over immigration decisions. *Id.* at 289. And it will block interstate commerce by expelling certain immigrants from the State.

The harms of enforcing H.B. 4156 cannot be understated. Oklahomans—like the individual plaintiffs and the members of Padres Unidos—who have spent most of their lives in the State will suddenly face prosecution and banishment. They will be uprooted

1

from the communities they have nurtured and separated from their families and loved ones. The Court should enjoin H.B. 4156 before it takes effect.

## BACKGROUND

### A. Congress's Pervasive Regulation of Immigration

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]." *Arizona v. United States*, 567 U.S. 387, 394 (2012). In the Immigration and Nationality Act ("INA"), Congress created a pervasive system to regulate entry into, continued presence in, and removal from the United States. *See generally*, 8 U.S.C. §§ 1101, 1151–1382. As the Fifth Circuit recently observed, "[t]his system is comprehensive, complex, and national in scope," and "provides multiple procedural channels to determine whether a noncitizen should be removed and [] a detailed process for reviewing those determinations." *Texas*, 97 F.4th at 285.

Congress's scheme balances several policy goals, including discouraging irregular entry between ports and providing for humanitarian and other protections. To do so, it offers federal officers a range of tools to regulate immigration, including civil immigration procedures and criminal charges.

On the civil side, Congress has specified categories of noncitizens who may be denied admission to the United States, 8 U.S.C. § 1182, including those who enter between ports of entry, *see id*. § 1182(a)(6). To decide whether a person who entered without inspection will be removed, Congress has established several alternative procedures, including full removal proceedings with trial-like processes subject to

2

administrative and judicial appeals, *id.* § 1229a, and expedited removal proceedings, a shortened form of proceedings applicable to recent border crossers, *id*. § 1225(b)(1).

On the criminal side, unlawful entry and reentry into the country are federal offenses, along with various other provisions related to irregular entries. 8 U.S.C. §§ 1325, 1326; *see also, e.g.*, *id*. §§ 1321, 1323, 1324 (criminalizing the "unauthorized landing of [noncitizens]," and "unlawful bringing of [noncitizens]" into the country). Unlawful entry and reentry are prosecuted in federal court, with charges brought at the discretion of federal officials, subject to rules and exceptions specified by Congress. *Id.* § 1329.

Even as it rendered noncitizens entering between ports "inadmissible" and subject to criminal penalties, Congress enacted a range of protections that are available despite unlawful entry. Asylum, a form of humanitarian protection that can lead to permanent residence and eventually citizenship, is specifically available "whether or not" a noncitizen enters "at a designated port of arrival," and "irrespective of such [noncitizen's] status." 8 U.S.C. § 1158(a)(1). Congress also barred federal officials from removing people to likely persecution or torture, in compliance with the United States' obligations under international treaties. *See id.* § 1231(b)(3); Pub. L. No. 105-277, Div. G, subdiv. B, title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231). In addition, individuals who entered unlawfully may apply for other forms of relief in removal proceedings, including cancellation of removal. *See* 8 U.S.C. § 1229b(b). Noncitizens who have entered without inspection may also apply affirmatively for numerous other forms of relief outside of removal proceedings,

3

including visas for victims of crimes and trafficking, *id*. § 1101(a)(15)(U), 1101(a)(15)(T); temporary protected status, *id*. § 1254(a); and classification as a Special Immigrant Juvenile for noncitizens under 21 years of age, *id*. § 1101(a)(27)(J).

Given the complexities of the immigration system, federal discretion and control are vital. "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. "Federal officials . . . decide whether it makes sense to pursue removal at all." *Id.* Federal officials choose among the several removal processes established by Congress. *See Biden v. Texas*, 597 U.S. 785, 792 (2022); *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520 (BIA 2011). Federal officials decide whether to deploy the associated criminal immigration charges. *See Texas*, 97 F.4th at 281; *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1265 (11th Cir. 2012). And once removal procedures have been initiated, federal officials decide whether to extend relief to otherwise removable noncitizens. *See, e.g.*, *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996).

**B.  Oklahoma H.B. 4156**

H.B. 4156 severely intrudes on this complex and exclusively federal system. It establishes two new state crimes that criminalize irregular entry and reentry, and authorizes banishment from Oklahoma, all without any input from federal officials.

Under the new law, a person commits an "impermissible occupation" ("State Illegal Entry") if "the person is an alien and willfully and without permission enters and remains in the State of Oklahoma without having first obtained legal authorization to enter the United States." H.B. 4156, § 2(B) (codified at Okla. Stat. Ann. tit. 21, § 1795(B)).

Affirmative defenses are available if the federal government has "granted" the noncitizen "lawful presence," "asylum," or "benefits under the federal Deferred Action for Childhood Arrivals program." *Id*. § 2(F). H.B. 4156 does not provide a defense for people who are in the process of seeking asylum, other humanitarian protection, or any other relief available under federal law. A first violation is a misdemeanor punishable by up to one year imprisonment in county jail. *Id*. § 2(C)(1). Subsequent violations are felonies punishable by up to two years imprisonment in state prison. *Id*. § 2(C)(2).

H.B. 4156 also makes it a crime for a noncitizen to enter, attempt to enter, or at any time be found in Oklahoma after they have been "denied admission, excluded, deported, or removed, or ha[ve] departed the United States while an order of exclusion, deportation, or removal is outstanding." H.B. 4156 § 2(D) ("State Illegal Reentry"). There is no criminal liability if the Attorney General consented to an individual's reapplying for admission, or if such consent was not required. *Id*. §§ 2(D)(1)-(2). A violation of State Illegal Reentry is punishable with up to two years in prison. *Id*. § 2(D).

After a conviction, "the person shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." H.B. 4156 §§ 2(C)(1), (2); *see also id*. § 2(D).

**C. Challenges to H.B. 4156.**

The United States has sued to enjoin H.B. 4156. *See United States v. Oklahoma*, No. 24-cv-00511 (W.D. Okla.). It sought a preliminary injunction on May 22, 2024. *Id*. ECF No. 4.

This suit was filed on May 23, 2024. The plaintiffs are Ximena Monserrat Lopez

Mena, Jordy Madrigal Martinez, Antonio Marquez, and Rene Doroteo Hernandez—long-time residents of Oklahoma who are undocumented and face arrest, prosecution, and expulsion from the State under H.B. 4156—and Padres Unidos de Tulsa, an organization committed to education for Latinx and immigrant communities whose members are confronted with the same dangers. *See* Lopez Mena Decl. ¶¶ 14-15; Martinez Decl. ¶¶ 5-13; Marquez Decl. ¶¶ 4-13; Hernandez Decl. ¶¶ 5-10; Lara Decl. ¶¶ 10-13; M.A. Decl. ¶¶ 7, 12. The defendants are Oklahoma Attorney General Gentner Drummond, Commissioner of Public Safety Tim Tipton, Oklahoma County District Attorney Vicki Behenna, and Tulsa County District Attorney Steve Kunzweiler. All are sued in their official capacities.

Plaintiffs respectfully ask the Court to issue a preliminary injunction in advance of the law's July 1, 2024 effective date.

## STANDARD OF REVIEW

A preliminary injunction should issue where Plaintiffs can demonstrate that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

### I.    H.B. 4156 is Preempted.

H.B. 4156 sets out to establish an Oklahoma-specific immigration system, in

which state police, prosecutors, and judges will punish entry into the United States, and require deportation of noncitizens from the State's borders. But entry, continued presence, and removal are quintessentially federal fields that Oklahoma may not regulate, because they are central to the federal government's exclusive immigration authority and Congress's comprehensive immigration scheme. Moreover, H.B. 4156 conflicts with federal law in numerous ways, especially by usurping federal discretion and control over sensitive immigration decisions and instead giving state officials unilateral control over immigration enforcement. It cannot stand.

### A. H.B. 4156 Intrudes on the Exclusively Federal Field of Entry.

Courts may infer field preemption from either a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). When it comes to regulating entry into the United States, both alternatives are satisfied.

"Policies pertaining to the *entry* of aliens and their right to remain here are entrusted exclusively to Congress." *Arizona*, 567 U.S. at 409 (quoting *Galvan v. Press,* 347 U.S. 522, 531 (1954)) (emphasis added, cleaned up). Ever since Congress began systematically regulating immigration, the Supreme Court has been crystal clear: Regulation of entry into the United States is an exclusively federal matter from which the States are excluded. *See, e.g.*, *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations

7

to our shores belongs to Congress, and not to the States."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *Hines v. Davidowitz*, 312 U.S. 52, 62 & n.10 (1941) (noting the "continuous recognition by this Court" of "the supremacy of the national power . . . over immigration"); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States [and] the period they may remain," and "the states are granted no such powers"); *De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."); *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982) (recognizing that "the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government" and noting "the exclusive federal control of this Nation's borders").

That unbroken line of precedent is grounded in the principle that immigration powers are "inherent in [the] sovereignty" of the United States as a nation. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). The federal government's sovereign authority includes the power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Id.*; *see also Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893); *Arizona*, 567 U.S. at 394-95. States, by contrast, are not endowed with such "powers of external

sovereignty." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316-18 (1936).[1]

Thus, as the Fifth Circuit recently explained in finding a similar Texas law field preempted: "For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power." *Texas*, 97 F.4th at 278-79. It necessarily follows that the federal interest in regulating entry into the country is—to say the very least—"dominant." *Arizona*, 567 U.S. at 399; *see Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250, 1264 (11th Cir. 2012) (federal interest in the "entry, movement, and residence" of noncitizens in the United States is "overwhelmingly dominant") (hereinafter "*GLAHR*").

Consistent with this dominant federal interest, Congress, through the INA, has enacted a "pervasive" framework to regulate individuals' entry and presence in the United States, and particularly individuals who enter the United States "without . . . legal authorization"—the same people Oklahoma is attempting to regulate through H.B. 4156. *Arizona*, 567 U.S. at 399; H.B. 4156 § 2(B). Indeed, the Fifth Circuit recently held that the "detailed statutory scheme" governing the "unlawful entry and reentry of noncitizens" indicates that Congress "occupies the entire field." *Texas*, 97 F.4th at 286 (holding that Texas law criminalizing entry and reentry by certain noncitizens was field preempted); *see also Lozano v. City of Hazleton*, 724 F.3d 297, 315 (3d Cir. 2013) (the INA contains a

---

[1] The federal government's exclusive authority derives from multiple constitutional sources, including its "power to establish a uniform Rule of Naturalization, its power to regulate Commerce with foreign Nations, and its broad authority over foreign affairs," *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (cleaned up, citations omitted); *see also Hines*, 312 U.S. at 62.

"comprehensive scheme" concerning "the terms and conditions of admission to the country").

"The [INA's] 'central concern' is the 'entry and stay of aliens' in the United States." *Texas*, 97 F.4th at 280 (citing *DeCanas v. Bica*, 424 U.S. 351, 359 (1976)). It contains detailed rules about who can enter the country, *see, e.g.*, 8 U.S.C. §§ 1153, 1184, along with detailed procedures to determine their right to remain here, *see, e.g.*, *id.* §§ 1225, 1229a. For people who enter the country without authorization, the federal scheme contains a variety of enforcement mechanisms: Congress has criminalized entry and re-entry between ports of entry, as well as efforts to assist or facilitate entry between ports. *See* 8 U.S.C. §§ 1325, 1326, 1323, 1324, 1327, 1328, 1329. Congress has provided a detailed set of standards and procedures to determine when people who enter without inspection may be arrested and detained by federal officials. *See, e.g.*, 8 U.S.C. §§ 1225(b), 1226(a)-(c), 1182(d)(5)(A). And Congress has provided a detailed process to determine whether people who enter between ports may remain in the United States. *See supra* Background Part A. Congress has frequently amended this statutory scheme, including multiple significant amendments to the provisions most relevant here. *See United States v. Texas*, No. 1:23-CV-1537-DAE, 2024 WL 861526, at *13 n. 12 (W.D. Tex. Feb. 29, 2024) (noting history of "countless statutes and treaties" to support field preemption). The federal entry scheme is as complex and "pervasive" as it gets, and therefore leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 399.

The Supreme Court has held similar state attempts to regulate basic immigration matters to be field preempted. In *Arizona*, the Court invalidated Section 3 of Arizona's

10

law, which criminalized failure to carry a federal noncitizen registration form, because Congress had already occupied that field, which implicated the federal government's external sovereign authority. *Id.* at 400-03. Everything *Arizona* said about noncitizen registration applies with even greater force "to the sensitive topic of noncitizens entering the country." *Texas*, 97 F.4th at 283. The federal entry scheme squarely addresses an aspect of the federal government's external sovereignty and is at least as pervasive as the alien registration laws—if not significantly more so. And, as with registration, if a state entry law "were valid, every State could give itself independent authority to prosecute federal [entry] violations, diminishing the Federal Government's control over enforcement[,] detracting from the integrated scheme of regulation created by Congress," and allowing prosecution "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402 (cleaned up); *see Texas*, 97 F.4th at 292 (describing *Arizona*'s concern that a state could imprison noncitizens "who federal officials determine should not be" prosecuted).

H.B. 4156 is thus field preempted under *Arizona*. In a preempted field like this, even state laws that have "the same aim as federal law and adopt[] its substantive standards" are invalid, because the "basic premise of field preemption" is clear: "States may not enter, *in any respect*, an area the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402 (emphasis added); *see also Texas*, 97 F.4th at 286. And here, there is a "further intrusion upon the federal scheme" because H.B. 4156's state entry crime imposes penalties that are more severe than those permitted under federal law.

*Arizona*, 567 U.S. at 402-3; *compare* H.B. 4156 § 2(C)(1) (imprisonment of up to one year) *with* 8 U.S.C. § 1325(a) (imprisonment of up to six months). These mismatches with federal law "simply underscore the reasons for field preemption." *Arizona*, 567 U.S. at 403.

In sum, when it comes to regulating noncitizens' entry into the United States, the case for field preemption is straightforward. "Congress established a comprehensive framework to identify *who* may enter, *how* they may enter, *where* they may enter, and *what* penalties apply for those who enter unlawfully." *Texas*, 97 F.4th at 283. As a result of this pervasive scheme—and because for 150 years the Supreme Court has reiterated that states lack authority over such matters—no state has successfully seized the federal government's prerogatives and set up its own state-law alternative immigration system. H.B. 4156 is field preempted and should be immediately enjoined.

**B. H.B. 4156's Expulsion Power Intensifies the Statute's Incompatibility with Federal Law.**

The fact that H.B. 4156's substantive crimes regulate entry (and reentry) is by itself enough to render them preempted, as just explained. And if those crimes are enjoined, the remaining provisions of H.B. 4156 must fall because they have no independent meaning or effect.

But H.B. 4156 goes further still, because in addition to imposing jail time, it would effectively banish a large set of immigrants from the State. The statute requires anyone convicted of an entry or re-entry crime to leave the State within 72 hours of completing their sentence. *See* H.B. 4156 §§ 2(C)(1), (2); 2(D). This threatens thousands of asylum

seekers, visa applicants, and others who have a federal right to remain in the United States, and whom the federal government may grant lawful status, permanent residence, and citizenship, with banishment from the State. Thus, H.B. 4156 not only imposes sanctions based on entry, it also provides that certain categories of noncitizens cannot live in Oklahoma.

Deciding who may or may not remain in the United States is central to regulating immigration. *See United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) ("The power to expel aliens has long been recognized as an exclusively federal power"); *see Arizona*, 567 U.S. at 409 ("[T]he removal process is entrusted to the decision of the Federal Government."). Congress has provided an exceptionally detailed set of standards and procedures to determine whether a noncitizen may remain in the United States. *See, e.g.*, 8 U.S.C. §§ 1225, 1229, 1229a, 1158, 1231(b)(3); *supra* Background Part A. This leaves no room for states enact their own expulsion schemes and choose for themselves which noncitizens can remain in their borders.

That Oklahoma proposes to deport noncitizens from the State rather than from the United States cannot save the statute. Such a "policy of expulsion" "conflicts with Congress's comprehensive statutory framework governing alien removal." *Alabama*, 691 F.3d at 1293-95 (invalidating similar attempt to expel a category of immigrants from a state, because states cannot "unilaterally determine that an[] alien unlawfully present in the United States cannot live within the state's territory"). The corollary of the United States's exclusive authority to decide who will be *removed* from the United States (or not), is the United States's exclusive authority to decide who may *remain* in the United

13

States—including in Oklahoma. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525

U.S. 471, 484 (1999) (discussing federal government's discretion to decide that "no

action will . . . be taken to proceed against an apparently deportable alien" for

"humanitarian reasons or simply for its own convenience") (hereinafter "*AADC*").

By unilaterally expelling asylum seekers and other noncitizens, H.B. 4156 subjects

them to requirements that directly conflict with federal law. Under federal law,

noncitizens have the right to remain in the United States while their federal immigration

proceedings play out. *See* 8 U.S.C. §§ 1225(b)(1)(A)(ii), 1231(a)(1)(A). Many have

explicit federal authorization to work in the United States. *See id*. § 1158(d)(2); 8 C.F.R.

§ 208.7. And federal law allows them to live and work in any state, including Oklahoma.

*See* 8 U.S.C. § 1229(a)(1)(F)(i) (allowing noncitizens to specify their address anywhere

in the United States). But H.B. 4156 provides that these same noncitizens *cannot* live in

Oklahoma, and instead must leave. This stark mismatch again "underscore[s] the reason

for field preemption," *Arizona*, 567 U.S. at 403, and illustrates why states have no

business deporting people.

Indeed, if every state could choose for itself which categories of noncitizens to

banish from their state, the result would be a chaotic patchwork of 50 separate

immigration systems, where states would unilaterally decide which immigration statuses

were permissible within their borders. This would severely burden federal operations and

erode federal control over immigration and foreign relations. And, of course, if every

state adopted that same policy, then the cumulative effect would be removal from the

United States. "[T]he immigration scheme would be turned on its head." *Alabama*, 691

14

F.3d at 1295 n.21.

## C. H.B. 4156 Conflicts with the Federal Immigration System.

In addition to field preemption, H.B. 4156 is conflict preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (cleaned up). This is true for several related reasons.

*First*, H.B. 4156 violates *Arizona*'s core teaching that states cannot act unilaterally to regulate immigration "without any input from the federal government." *Arizona*, 567 U.S. at 408. Letting Oklahoma unilaterally prosecute entry and reentry violations here would allow it to "achieve its own immigration policy," *id.*—a result that *Arizona* repeatedly rejects.

Section 6 of the challenged Arizona law allowed state officers to make warrantless arrests of noncitizens who were possibly removable. The Court held that the provision was preempted because it allowed "unilateral state action" that disregarded the "significant complexities involved in enforcing federal immigration law" and usurped the federal government's ability to exercise discretion and weigh competing humanitarian, foreign policy, and other considerations. *Arizona*, 567 U.S. at 407-10. Section 3—the registration scheme discussed above—was similarly preempted because (among other things) it allowed unilateral state prosecutions for what were effectively violations of federal law. Such "independent authority to prosecute" would "diminish the federal government's control over enforcement," upend the "careful framework Congress adopted," and "frustrate federal policies." *Id.* at 402 (cleaned up). And Section 2(B), which directed state police officers to contact immigration authorities during traffic stops,

15

*would* have been preempted if it allowed unilateral detention "without federal direction and supervision." *Id*. at 413.[2]

Thus the through line of the entire *Arizona* decision—as *Texas* recently confirmed—is that federal law does not allow "unilateral state action" in the field of immigration enforcement. *Arizona*, 567 U.S. at 410; *see also Texas*, 97 F.4th at 289-90; *United States v. Texas*, 586 F. Supp. 3d 574 (W.D. Tex. 2022) (invalidating state law for this reason). And if unilateral *arrests* alone were enough for preemption in *Arizona*, then unilateral arrests, prosecutions, and detention under H.B. 4156 must be preempted as well. *See Arizona*, 567 U.S. at 410.[3]

*Second,* H.B. 4156 frustrates Congress's statutory scheme by preventing federal authorities from balancing a range of interests in deciding how to process noncitizens who enter the United States. A "principal feature" of the immigration system is the "broad discretion" Congress gave to federal officials. *Arizona*, 567 U.S. at 396. Specifically, Congress has provided federal Executive Branch officials a range of tools to address noncitizens who enter without legal authorization. Federal prosecutors may

---

[2] The Court ultimately rejected the facial challenge to Section 2(B) because it "could be read" to merely authorize state officers to "communicate with ICE," which is expressly permitted under federal law. 567 U.S. at 411-13. But unlike mere communication, nothing in federal law permits arrests, prosecutions, and state expulsions "absent any request, approval, or other instruction from the Federal Government." *Id*. at 410.

[3] H.B. 4156 also erodes federal discretion through multiple "inconsistenc[ies] between" H.B. 4156's entry and reentry crimes "and federal law." *Arizona*, 567 U.S. at 402-03. Those convicted of the state entry crime can be imprisoned for up to a year, whereas 8 U.S.C. § 1325 only authorizes a six-month sentence. And most glaringly, those convicted of the state entry and reentry crimes are expelled from the state after serving their sentence, a sanction that appears nowhere in federal law.

choose to bring criminal charges under 8 U.S.C. §§ 1325 or 1326; immigration officials may initiate ordinary removal proceedings, *id*. § 1229a, or expedited proceedings if applicable, *id*. § 1225(b)(1); and immigration agents or administrative hearing officers may exercise discretion to forego removal proceedings, defer removal, or take other discretionary action to ameliorate the potential harshness of the immigration laws. *See Arizona*, 567 U.S. at 396, 409. Such federal discretion is critical because it "implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives,'" and "immediate human concerns." *United States v. Texas*, 599 U.S. 670, 679 (2023) (quoting *AADC*, 525 U.S. at 490-91); *Arizona*, 567 U.S. at 395-96.

Yet under H.B. 4156, even if federal officials conclude that a particular prosecution or set of prosecutions would harm relations with a foreign country, or would undermine humanitarian protections, or jeopardize a "criminal investigation," or conflict with our international obligations, they would have no say in the matter. *Arizona*, 567 U.S. at 396-97, 408 (citing these as reasons why unilateral state action is preempted).

The Supreme Court has explained time and time again that immigration decisions are so deeply intertwined with foreign relations that they "must be made with one voice." *Arizona*, 567 U.S. at 409; *see also Biden v. Texas*, 597 U.S. 785, 805-06 (2022). The danger that unilateral state immigration regulation could "embroil us in disastrous quarrels" undergirds 150 years of Supreme Court precedent confirming that immigration regulation "is *exclusively* a federal power." *Chy Lung*, 92 U.S. at 279-80; *Texas*, 97 F.4th at 278-79. That risk is even more pronounced here than it was in *Arizona*. Section 6 was invalid because it permitted "the unilateral decision of state officers to arrest an alien for

17

being removable absent any request, approval, or other instruction from the Federal

Government." 567 U.S. at 410. H.B. 4156 does exactly that because it allows state

officers to unilaterally arrest people for immigration violations. But it also does much

more, because it allows state officers to unilaterally prosecute and remove people from

the state, without any federal involvement whatsoever. "Decisions of this nature touch on

foreign relations," and are "vested solely on the Federal Government." *Id*. at 409-10

(citing *Truax*, 239 U.S. at 42).

H.B. 4156 takes away this critical federal discretion. Whereas the "INA provides

the federal government discretion to decide whether to initiate criminal proceedings or

civil immigration proceedings once a noncitizen is apprehended," Oklahoma's scheme

"blocks this exercise of discretion." *Texas*, 97 F.4th at 289. H.B. 4156 operates with blunt

force: noncitizens found violating the state law are arrested and charged with a crime

"and the federal government has no voice" in the matter. *Id*. The law casts aside the

"federal concerns [and] priorities that Congress has explicitly granted" the Executive to

establish with respect to enforcement of the Nation's immigration laws. *GLAHR*, 691

F.3d at 1265.

*Finally*, H.B. 4156 overrides Congress's intent by granting state officials authority

to make decisions regarding a noncitizen's immigration status. "The federal government

alone . . . has the power to classify non-citizens." *Villas at Parkside Partners v. City of

Farmers Branch, Tex.*, 726 F.3d 524, 536 (5th Cir. 2013). Given the "significant

complexities involved in enforcing federal immigration law," Congress has entrusted the

process to "federal officers who have received training." *Arizona*, 567 U.S. at 408, 409.

Yet, the new Oklahoma law places state officials in the "impermissible position" of

enforcing state law "based on their immigration status determinations without federal

direction and supervision." *Farmers Branch, Tex.,* 726 F.3d at 532 (citing *Arizona*, 567

U.S. at 413).

Under H.B. 4156, state officials untrained in immigration law are tasked with

deciding whether "the federal government has granted . . . lawful presence in the United

States." H.B. 4156 § 2(F)(1)(a). That term has no general meaning in immigration law

that applies to the question of whether a noncitizen should be permitted to enter or remain

in the United States; rather, as noted above, those questions are answered through federal

removal proceedings as well as Executive discretion. And with no federal "definition that

would be applicable" in this context, H.B. 4156 "open[s] the door to conflicting state and

federal rulings." *Farmers Branch, Tex.*, 726 F.3d at 533, 536. H.B. 4156 similarly

requires state officials to make other determinations about federal immigration law that

may conflict with federal determinations. *See, e.g.,* H.B. 4156 § 2(D)(1), (2) (whether

exceptions to 8 U.S.C. § 1326(a) apply); § 2(D) (whether someone was "denied

admission" or departed "while an order of exclusion, deportation, or removal is

outstanding"); § 2(B) (whether someone "obtained legal authorization to enter the United

States").

### D.  H.B. 4156 violates the Commerce Clause.

The Constitution provides that Congress may "regulate Commerce with foreign

Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8,

cl. 3. The Commerce Clause also has a dormant component that prevents a State "from

retreating into economic isolation" by passing laws that discriminate against interstate commerce. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (citation omitted); *see Ore. Waste Sys., Inc. v. Dep't of Env't Quality of Ore.*, 511 U.S. 93, 99 (1994).

"The clearest example of [discriminatory] legislation is a law that overtly blocks the flow of interstate commerce at a State's borders." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); *see also Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935) (states cannot "set a barrier to traffic between one state and another"). The Supreme Court has thus repeatedly invalidated laws that constitute an "attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *See City of Philadelphia*, 437 U.S. at 627-28 (collecting cases).

"[P]recedents firmly establish[] that the federal commerce power surely encompasses the movement in interstate commerce of *persons* as well as commodities." *United States v. Guest*, 383 U.S. 745, 758-59 (1966) (emphasis added). Thus, it is interstate commerce for a person to travel from one state to another. *Covington & C. Bridge Co. v. Commonwealth of Kentucky*, 154 U.S. 204, 218 (1894) (explaining that "to travel in person from Cincinnati to Covington" constitutes interstate commerce); *Hoke v. United States*, 227 U.S. 308, 320 (1913) (similar).

Recognizing that the movement of persons into and out of a state is interstate commerce, the Supreme Court held in *Edwards v. California* that the Commerce Clause was violated where California attempted to "fenc[e] out indigent immigrants"—that is, people seeking to move there from out of state. *City of Philadelphia*, 437 U.S. at 627

20

(citing *Edwards*, 314 U.S. 160, 173-74 (1941)). There, California "assert[ed] that the huge influx of migrants into California in recent years has resulted in problems of health, morals, and especially finance." *Edwards*, 314 U.S. at 173. California thus contended "that a State may close its borders to the interstate movement of paupers." Respondent's Br., 1941 WL 52964, at *2 (1941). But the Supreme Court concluded that California's statute violated the Commerce Clause's "prohibition against attempts on the part of any single State to isolate itself from difficulties common to all of them by restraining the transportation of persons and property across its borders." *Edwards*, 314 U.S. at 173.

So too here. H.B. 4156 "overtly blocks the flow of interstate commerce at a State's borders," *City of Philadelphia*, 437 U.S. at 624, by banning certain noncitizens—namely those who irregularly entered the United States—from the State of Oklahoma. The statute reinforces that ban by forcing any noncitizen convicted of violating the statute to leave the state within three days of their conviction. Because H.B. 4156 discriminates against interstate commerce by banning certain categories of immigrants from entering Oklahoma, H.B. 4156 is "virtually per se invalid" under the Commerce Clause. *Ore. Waste Sys., Inc.*, 511 U.S. at 99.

Like California, Oklahoma asserts that problems are caused by migration into the State. *See* H.B. 4156 § 1 (referring to "fentanyl distribution" and other issues).[4] Even if

---

[4] Oklahoma's attempt to blame these problems on undocumented people is factually baseless. For example, fentanyl overwhelmingly enters the United States through ports of entry, not through irregular migration, and is smuggled by U.S. citizens, not migrants. *See* David Bier, *Fentanyl Is Smuggled for U.S. Citizens by U.S. Citizens, Not Asylum Seekers*, Cato Inst. (Sept. 14, 2022) ("[F]entanyl is smuggled through official crossing points specifically because it is easier to conceal it on a legal traveler or in legal

there were merit to Oklahoma's concerns, H.B. 4156 is not a constitutional way to address them. Oklahoma cannot penalize crossing state lines or expel people from the State in order "to isolate itself from difficulties common to" the country as a whole. *Edwards*, 314 U.S. at 173.

Because H.B. 4156 discriminates against interstate commerce by banning certain categories of immigrants from entering Oklahoma, H.B. 4156 is "virtually per se invalid" under the Commerce Clause. *Ore. Waste Sys., Inc.*, 511 U.S. at 99.

## II.    Plaintiffs Will Suffer Irreparable Injury Absent an Injunction.

Absent an injunction, beginning July 1, the individual plaintiffs and members of Padres Unidos will suffer irreparable harm by being placed at risk of arrest, prosecution, and detention under a state statute preempted by federal law. It is well established that "the threat of criminal prosecution" under a preempted state law "constitutes irreparable harm for purposes of a preliminary injunction." *Farmworker Ass'n of Fla., Inc. v. Moody*, No. 23-CV-22655, 2024 WL 2310150, at *17 (S.D. Fla. May 22, 2024) (citation omitted); *see also, e.g., GLAHR* 691 F.3d at 1269; *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *Georgia Latino All. for Hum. Rts. v. Deal*, 793 F. Supp. 2d 1317, 1339 (N.D. Ga. 2011); *Villas at Parkside Partners v. City of Farmers Branch*, 577

---

goods than it is to conceal a person crossing the border illegally."), https://perma.cc/8RTW-MENH; *see* U.S. Sent'g Comm'n, *Quick Facts: Fentanyl Trafficking Offenses* (2022), https://perma.cc/XDY9-S49M; Statement of Brian Sulc, Executive Director, Transnational Organized Crime Mission Center, Office of Intelligence and Analysis, Department of Homeland Security (May 18, 2022), https://perma.cc/76WQ-4YTU. In any event, the State cannot demonstrate that H.B. 4156's entry ban serves any "legitimate local purpose" that "cannot be adequately served by reasonable nondiscriminatory alternatives." *Ore. Waste Sys., Inc.*, 511 U.S. at 101.

F. Supp. 2d 858, 878 (N.D. Tex. 2008). That harm is exacerbated by the statute's removal provision, which further threatens to banish the plaintiffs and others like them. They would face the trauma of being separated from their families, who would lose needed medical care and financial support, and Ms. Lopez Mena would face a severe disruption to her education. Lopez Mena Decl. ¶¶ 14-15, 17-18; Martinez Decl. ¶¶ 14-15; Marquez Decl. ¶¶ 14-15; Hernandez Decl. ¶ 11; Lara Decl. ¶ 13; M.A. Decl. ¶ 12.

Preventing people from caring for themselves and their families constitutes irreparable injury. *See Evans v. Utah*, 21 F. Supp. 3d 1192, 1210 (D. Utah 2014). Each threatened injury to Plaintiffs' family unity, health, educational opportunity, and loss of home, standing alone, would warrant a finding of irreparable harm. *See Reiland v. Indep. Sch. Dist. No. 11 of Tulsa Cnty., Oklahoma*, No. 22-CV-484, 2022 WL 20689737, at *4 (N.D. Okla. Nov. 1, 2022) (preventing plaintiff from attending child's school activities constituted irreparable injury); *Brown v. Day*, 434 F. Supp. 2d 1035, 1039 (D. Kan. 2006) (risk of deprivation of basic life necessities constitutes irreparable injury); *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003) (irreparable harm based on the risk of "trauma to already troubled children").

## III.  The Balance of Equities and Public Interest Support an Injunction.

The balance of equities tips decisively in favor of the Plaintiffs, and an injunction is strongly in the public interest. When the Defendants are governmental actors, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In contrast to the real and severe harms faced by Plaintiffs, the State has no legitimate interest in enforcing an unconstitutional law or regulating in an exclusively federal arena. *Alabama*, 691 F.3d

at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation");

*Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (states faced no

injury from injunction of preempted regulation); *Colo. Motor Carriers Ass'n v. Town of

Vail*, No. 23-CV-2752, 2023 WL 8702074, at *11 (D. Colo. Dec. 15, 2023) ("the Town

does not have a strong interest in enforcing a law that is reasonably likely to be found

constitutionally infirm" under preemption principles). The public interest also clearly

favors an injunction. States' "[f]rustration of federal statutes and prerogatives [is] not in

the public interest." *Alabama*, 691 F.3d at 1301; *Texas*, 2024 WL 861526, at *40 (same).

That is particularly so where state action invades federal domains and interferes with

federal foreign relations. *See, e.g.*, *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,

715 F.3d 1268, 1290 (11th Cir. 2013).

Additionally, H.B. 4156 will erode the public trust that law enforcement has

worked to create with migrant communities that is integral to public safety. Indeed, the

Oklahoma Association of Chiefs of Police and Metro Law Enforcement Agency Leaders

has stated that H.B. 4156 "places crime victims at risk by increasing the fear of reporting

to law enforcement" and threatens to "deteriorate public trust in law enforcement in

already vulnerable communities, ultimately resulting in increased public safety

concerns."[5] The Association warned that H.B. 4156 will "destroy the connections and

relationships we have built within our local immigrant communities and set us back for

many years to come." *See Texas*, 2024 WL 861526, at *40 ("Because SB 4 authorizes

---

[5] KOKH Staff, *Oklahoma Association of Chiefs of Police Release Joint Statement on HB 4156*, OKC Fox 25 (May 14, 2024), https://perma.cc/PR5E-L4F6.

state police officers to arrest many unauthorized noncitizens, victims of abuse or human trafficking will risk arrest and removal if they report their crimes," making "noncitizen crime victims less likely to report violent crimes."); *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 270 (S.D.N.Y. 2020) (enjoining public charge rule due to its chilling effect on immigrants seeking services).

To be sure, Oklahoma has concerns about immigration and disagrees with the current federal Administration on immigration policy questions. But under our constitutional structure, that "is not a controversy between equals," *Texas*, 2024 WL 861526, at *40, for "state and local interests are subservient to those of the nation at large" when it comes to the government's sovereign immigration power, *Texas*, 97 F.4th at 296. Oklahoma may have "frustrations" with immigration or federal policy, "but the State may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 416.

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction.

Dated: May 24, 2024                      Respectfully submitted,

Noor Zafar*                              /s/ *Elissa Stiles*
Wafa Junaid*                             Elissa Stiles (OK Bar. No. 34030)
Omar Jadwat*                             Rivas and Associates
American Civil Liberties Union           P.O. Box 470348
Foundation, Immigrants' Rights Project   Tulsa, OK 74147
125 Broad Street, 18th Floor             T: (918) 419-0166
New York, NY 10004                       F: (918) 513-6724
T: (212) 549-2660                        *estiles@rivasassociates.com*
*nzafar@aclu.org*
*wjunaid@aclu.org*
*ojadwat@aclu.org*

Spencer Amdur*
Oscar Sarabia Roman*
Cody Wofsy*
American Civil Liberties Union
Foundation, Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
*samdur@aclu.org*
*osarabia@aclu.org*
*cwofsy@aclu.org*

Nicholas Espíritu*
Tanya Broder*
National Immigration Law Center
3450 Wilshire Blvd., No. 108-62
Los Angeles, CA 90010
T: (213) 639-3900
F: (213) 639-3911
*espiritu@nilc.org*
*broder@nilc.org*

Megan Lambert (OK Bar. No. 33216)
Devraat Awasthi (OK Bar. No. 35544)
American Civil Liberties Union of
Oklahoma Foundation
P.O. Box 13327
Oklahoma City, OK 73113
T: (405) 525-3831
*mlambert@acluok.org*
*dawasthi@acluok.org*

*Attorneys for Plaintiffs*
*\*Pro hac vice application forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2024, I filed the attached motion with the Clerk

of Court and served the attached document by service processor on the following, who

are not known registered participants of the Electronic Case Filing System:

GENTNER DRUMMOND, in his official capacity as Attorney General of the State of
Oklahoma
313 NE 21st Street
Oklahoma City, OK 73105

TIM TIPTON, in his official capacity as Commissioner of Public Safety for the
Oklahoma Department of Public Safety
3600 North Martin Luther King Avenue
Oklahoma City, OK 73111

VICKI BEHENNA, in her official capacity as District Attorney of Oklahoma County
211 N. Robinson, #N700
Oklahoma City, OK 73102

STEVE KUNZWEILER, in his official capacity as District Attorney of Tulsa County
500 South Denver Avenue
Tulsa, Oklahoma 74103

*/s/ Elissa Stiles*
Elissa Stiles (OK Bar. No. 34030)
Rivas and Associates
P.O. Box 470348
Tulsa, OK 74147
(918) 505-4870 T | (918) 513-6724 F
estiles@rivasassociates.com

*Counsel for Plaintiffs*

27